UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ALLISON DEE WACCO                                  CIVIL ACTION

VERSUS                                             NUMBER: 18-8872

ANDREW SAUL,                                       SECTION: "A"(5)
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying Plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based upon disability. (Rec. docs. 8, 12).

Allison Dee Wacco, Plaintiff herein, filed the subject applications for DIB and SSI benefits on April 6, 2015, alleging disability as of November 13, 2013 or January 1, 2012, respectively. (Tr. pp. 199-200, 193-198). In a "Disability Report-Adult" form that appears in the administrative record below, the conditions limiting Plaintiff's ability to work were identified as back and right knee problems as well as stage II Paget's cancer. (Tr. pp. 214-222). Plaintiff's applications for Social Security benefits were denied at the initial level of the Commissioner's administrative review process on January 20, 2016. (Tr. pp. 134-137, 138-141). Pursuant to Plaintiff's requests, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on April 5, 2017 at which Plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 142, 143-145, 25-26). At the outset of that hearing, Plaintiff was granted leave to amend the alleged disability onset date

to April 23, 2015.  (Tr. p. 31).  On August 25, 2017, the ALJ issued a written decision in which

she concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

(Tr. pp. 8-25).  The Appeals Council ("AC") subsequently denied Plaintiff's request for review

of the ALJ's decision on July 25, 2018, thus making the ALJ's decision the final decision of the

Commissioner.  (Tr. pp. 191-192, 1-5).  It is from that unfavorable decision that the Plaintiff

seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1382(c)(3).

In her cross-motion for summary judgment, Plaintiff frames the issues for judicial

review as follows:

> I.   THE COMMISSIONER DID NOT APPLY THE CORRECT LEGAL
> STANDARD WHEN ASSESSING PLAINTIFF'S RESIDUAL
> FUNCTIONAL CAPACITY AND THAT FINDING IS NOT
> SUPPORTED BY SUBSTANTIAL EVIDENCE.
>
> II.  THE COMMISSIONER COMMITTED HARMFUL LEGAL
> ERROR BY FAILING TO APPLY MEDICAL-VOCATIONAL
> GUIDELINE 201.09.

(Rec. doc. 8-3, p. 10).

Relevant to the resolution of the foregoing issues are the following findings that were

made by the ALJ:

> 1.  The claimant meets the insured status requirements of the
> Social Security Act through December 31, 2015.
>
> 2.  The claimant has not engaged in substantial gainful activity
> since April 23, 2015, the alleged onset date (20 CFR
> 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3.  The claimant has the following severe impairments:  lumbar
> spondylosis with tiny annular tear/herniation of [the] L4-5
> vertebral disc with radiculopathy, mild osteoarthritis and
> chrondomalacia of the right knee, left breast Paget's
> carcinoma of the left breast with lymph node metastasis,
> bursitis of the left elbow, major depressive disorder, anxiety
> disorder, somatic symptom disorder, and diabetes mellitus.
> (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs.  She could not climb ladders, ropes, or scaffolds.  She can perform tasks commensurate with a[] specific vocational preparation (SVP) level of two or less, and would be limited to occasional interaction with coworkers, supervisors, and the public.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on October 23, 1965 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 23, 2015 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. pp. 13, 14, 16, 19, 20).

3

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries:  (1) whether substantial evidence of record supports the Commissioner's decision and (2) whether the decision comports with relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1970).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner.  *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act.  *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of

performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at 475. In making this determination, the Commissioner uses the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings;

2.  An individual who does not have a "severe impairment" will not be found to be disabled;

3.  An individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors;

4.  If an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made;

5.  If an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner finds that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1302.

The medical evidence generated during the relevant time period begins with records from the Ochsner Baptist Medical Center and the St. Bernard Health Center ("SBHC"), where Plaintiff was seen on April 27, 2015.  At the former facility, Plaintiff was followed for and underwent testing related to her left breast cancer and mastectomy she had undergone on December 26, 2014.  (Tr. pp. 839-843).  At the latter facility, Plaintiff received a medication review in connection with the assessed conditions of anxiety disorder, not otherwise specified, and chronic obstructive pulmonary disease with acute lower respiratory infection. (Tr. p. 952).  Plaintiff was seen again at Ochsner for further breast cancer follow-up care on April 30, 2015 with complaints of chronic mild fatigue and mild intermittent nausea without vomiting that was mildly relieved with a prescribed antiemetic regimen.  Upon physical examination, Plaintiff had a normal range of motion throughout the musculoskeletal systems with no edema or tenderness.  Mood and affect were normal.  The assessment was:  1) breast cancer, left; 2) encounter for antineoplastic chemotherapy; 3) fatigue; 4) deep venous thrombosis ("DVT"), unspecified laterality; 5) nausea; and 6) anxiety disorder, unspecified type. Various medications were prescribed.  (Tr. pp. 376-384).

Further breast cancer follow-up care was administered on May 12 and 14, 2015.  On the latter date, Plaintiff complained of mild fatigue, "chemo brain," dizzy spells, and occasional headaches.  She also complained of an intermittent productive cough.  A physical examination was largely unremarkable and Plaintiff exhibited a normal mood and affect.  An MRI of the brain had apparently been done recently which revealed no metastatic disease. The assessment was:  1) breast cancer, left; 2) encounter for antineoplastic chemotherapy; 3) DVT of unspecified laterality; 4) tobacco abuse; 5) dizziness; 6) anxiety disorder of

unspecified type; 7) fatigue; and 8) an upper respiratory infection.  Medications were prescribed and adjusted.  (Tr. pp. 844-848, 385-392, 294).

On May 20, 2015, Plaintiff was seen again at SBHC for complaints of a constant productive coughing and some shortness of breath.  Plaintiff was to be undergoing her last round of chemo/radiation in the next week and she was at that time unable to resume pool physical therapy due to the presence of the chemotherapy port.  Upon physical examination, Plaintiff appeared to be in good spirits and was noted to joke a good deal despite having some hair loss over the eyebrows and into the scalp.  The assessment was chronic bronchitis with acute exacerbation.  Plaintiff's medications were adjusted.  (Tr. pp. 950-951).  Another MRI of the brain was performed on May 21, 2015 which revealed no acute findings.  (Tr. pp. 849-851).  A refill on antibiotics was phoned in on May 26, 2015, the same day that Plaintiff received further breast cancer treatment.  (Tr. pp. 949, 852-856).

Plaintiff was seen again at Ochsner on May 28, 2015 for additional cancer follow-up care, complaining of chronic fatigue, difficulty concentrating, and some episodes of dizziness.  A physical examination was unremarkable except for a hyperpigmented lesion to Plaintiff's left forearm.  The assessment on this date was:  1) breast cancer, left; 2) chemotherapy administration; 3) DVT of the right upper extremity; 4) unspecified anxiety disorder; 5) fatigue; and 6) anemia due to chemotherapy.  A treatment plan was implemented.  (Tr. pp. 393-400).  Plaintiff presented to SBHC on June 1, 2015, seeking a refill of pain medication which was declined pending the return of her physician, Dr. Jancich, the following week.  (Tr. p. 949).  Medication refills were sought again on June 18, 2015.  Plaintiff reported being very irritable secondary to excessive demands on her life by family members which made her anxiety worse.  Otherwise, Plaintiff was characterized as having "good self care" and visiting

places like City Park.  Nevertheless, she was described as "tired appearing, [a] fair historian, [and having] a lot of excuses."  The assessment was insomnia and anxiety disorder, not otherwise specified.  Various medications were either refilled or prescribed.  (Tr. pp. 946-948).  On June 22, 2015, Plaintiff underwent further breast cancer treatment at Ochsner as well as undergoing bloodwork.  (Tr. pp. 857-861).  No evidence of malignancy was detected following mammographic studies on July 27, 2015.  (Tr. pp. 862-864).

On August 7, 2015, Plaintiff underwent a consultative physical evaluation by Dr. Walter Ellis of Internal Medicine Associates of New Orleans, LLC.  Presenting complaints were stage II Paget's cancer and back and right knee problems.  Plaintiff had completed chemotherapy approximately one month earlier and removal of the port was scheduled in 10 days.  Her low back pain had been chronic over the years, unassociated with any accidents or trauma, and her right knee pain was related to a motor vehicle accident that required the insertion and subsequent removal of hardware.  Plaintiff was said to be independent in the activities of daily living and she could drive and do some light household chores.  Occasional headaches were relieved with Tylenol, sleep was described as poor, and Plaintiff noted frequent fatigue, nervousness, and occasional dizziness.  Plaintiff denied syncope, convulsions, paralysis, and any involuntary movements or disorders of coordination. However, she reported that her memory was fair to poor.  Upon physical examination, Plaintiff was able to ambulate with a normal gait and station and without the use of an assistive device but she did have a slightly decreased range of motion of the lumbar spine. Straight leg raising was negative.  Range of motion to the right knee was also slightly reduced in extension-flexion.  Neurologically, muscle tone, bulk, and strength were preserved in all four extremities and all modalities of sensation and deep tendon reflexes were intact.  On

mental status examination, Plaintiff appeared to be of average intelligence with normal understanding, cooperation, concentration, attention, and memory with no visible nervousness or a depressed mood.  X-ray studies of the right knee showed decreased joint space to the medical and lateral compartments consistent with mild osteoarthritis.  From a functional standpoint, Plaintiff's gait and station were normal; she was able to perform heel and tiptoe movements steadily without complaints of pain in the feet and ankles; hand grip strength, handling, and fingering were normal bilaterally; and, pushing, pulling, reaching and crouching could be performed without difficulty.  The diagnosis was stage II Paget's disease, low back pain, right knee pain, and mild osteoarthritis.  (Tr. pp. 403-409).

Plaintiff underwent a bone density test at Ochsner on September 2, 2015 which produced normal results.  (Tr. pp. 865-867).  She was subsequently seen at SBHC on September 16, 2015 for complaints of swollen feet, sleep difficulties, and anxiety and for medication refills.  Plaintiff also complained of worsening back pain and increased fatigue, reportedly barely getting out of the house for appointments.  Headaches were occasional.  She appeared tired and pale and was described as being in a "chronically ill" level of distress with limited ambulation secondary to being easily fatigued.  Plaintiff demonstrated poor insight and a depressed mental status.  On physical examination, there was non-pitting edema to the knees bilaterally, diffusely tender to palpation "but out of proportion to [the] exam."  The assessment was primary malignant neoplasm of the breast, poorly controlled anxiety, spinal stenosis of the lumbar region, and swelling of the lower leg.  Anxiety medication was prescribed and Plaintiff was referred for physical therapy and a venous doppler ultrasound test.  (Tr. pp. 937-942).

On September 20, 2015, Plaintiff presented to the Baptist Ochsner Emergency Department complaining of leg swelling of one week's duration for which she had taken her mother's unidentified fluid pills. However, upon physical examination, Plaintiff had no lower extremity edema, no erythema or warmth of the lower extremities, and no palpable cord in the lower extremities. Plaintiff was discharged home after being administered a dose of steroids and was instructed to follow-up with her primary care physician. (Tr. pp. 711-748). Plaintiff underwent a venous doppler ultrasound of the lower extremities on September 22, 2015 which was negative for DVT. (Tr. p. 943). She was next seen at SBHC on October 16, 2015 for complaints of fluid in the ankles and feet for the previous two to three days, intermittent throughout the previous month. Plaintiff was said to "be[] more active in the last few days, moving houses and running groceries." No shortness of breath was present and Plaintiff ambulated normally. There was 2+ pretibial pitting edema bilaterally but calf size was symmetric and no calf pain or varicosities were appreciated. The assessment was swelling of the lower leg of unknown etiology and primary malignant neoplasm of the breast. Plaintiff was directed to wear compression socks and to elevate her legs. (Tr. pp. 935-937).

Plaintiff returned to Ochsner for further follow-up care related to her breast cancer on November 16, 2015. (Tr. pp. 868-872). Another trip to the Ochsner Emergency Department on December 16, 2015 was precipitated by bilateral leg swelling for a few days, worse during the day and productive of pain at a level of "8." Examination revealed mild swelling of the left upper extremity along with 1+ pitting edema but no erythema, 2+ radial pulses equal bilaterally, and trace pretibial edema bilaterally. An ultrasound of the left upper extremity demonstrated no evidence of acute DVT. The same result was obtained following an ultrasound of the lower extremities. A chest x-ray revealed no changes from one

previously taken on September 20, 2015.  The clinical impression was edema to the extremities, swelling, and an elevated brain natriuretic peptide ("BNP") level.  Plaintiff was administered a dosage of Lasix and was discharged home with instructions to follow-up with her primary care physician.  (Tr. pp. 749-781).  She was subsequently seen at SBHC on January 4, 2016 for monitoring of her leg edema and for medication refills.  Plaintiff was not wearing compression socks at the time and was said to be spending "… a lot of time on [her] feet cleaning or doing housework."  Ambulation was normal.  Plaintiff presented as somewhat anxious and agitated and tended to get tremulous when angry.  There was non-pitting edema to the calves bilaterally, externally warm and well-perfused, and 1+ DP pulses bilaterally.  The assessment was:  1) primary malignant neoplasm of the breast, 2) anxiety, 3) gastroesophageal reflux disease and 4) dependent edema "… from working on [her] feet …"  Compression socks and elevation were recommended for the latter condition.  (Tr. pp. 932-935).

On January 8, 2016, Plaintiff underwent a consultative psychological evaluation by Dr. Scuddy Fontenelle, III.  During the course of the evaluation, Plaintiff reported being depressed most of her adult life as well as feeling inadequate for not having completed high school, resulting in her frequently being overwhelmed with the stresses of life.  She unsuccessfully attempted suicide when she was a young adult.  She reported becoming easily upset over minor life events, had experienced a panic attack the previous day, and frequently did not want to leave the house as a result of her medical problems.  Also reported were a lack of energy, fatigue, and social avoidance.  Plaintiff was divorced at the time and a mother of two children.  She demonstrated mild motor tremors during the session, frequently shaking her hands, and the doctor was uncertain whether it was a neurological condition or

possibly a medication side-effect.  Plaintiff also cried during the session but speech was understandable and motivation and cooperation were fair.  Her thinking was logical and rational but thought content was focused on chronic knee and back pain.  She reported a herniated disc at L-4/L-5 but was unable to relate it to any actual condition.  There were no hallucinations or evidence of paranoid thinking, thought disorganization, perceptual disturbances, or clinical psychosis.

Dr. Fontenelle described Plaintiff's mood and affect as depressed and overly emotional, with feelings of despair and hopelessness, symptoms of anxiety over health-related problems and stress, and frequent panic attacks.  Plaintiff denied suicidal ideation but did admit to anhedonia, social avoidance, and a lack of interest in pleasurable activities. Her cognitive ability was considered to be at the low average range, social comprehension and conversational skills were normal, and personal insight was fair.  Functionally, Plaintiff reported that she struggled to get out of bed in the morning due to back and knee pain, frequently feeling fatigued with no energy or motivation and not changing out of her bed clothes at times.  She avoided socializing with others and experienced significant anxiety and panic attacks when having to do certain tasks such as paying bills or attending doctor's appointments.  The doctor opined that Plaintiff would likely struggle in her attempts to complete job duties as her pace, concentration, and persistence were extremely limited due to medical factors and her relationships with co-workers and supervisors were problematic due to depression and persistent anxiety.  The diagnostic impressions were:  major depression disorder, recurrent and moderate; anxiety disorder due to "medical condition;" and somatic symptom disorder with persistent pain.  The prognosis was characterized as extremely guarded.  In the "Recommendations" portion of his medical report, Dr. Fontenelle

wrote that Plaintiff was capable of managing funds and was compliant with prescription medication.  He also noted that Plaintiff showed mild motor tremors during the session and that "[s]he has struggled with her motor skills and motor activity due to motor tremors." (Tr. pp. 412-415).

Plaintiff returned to SBHC on February 10, 2016, requesting a refill on her anxiety medication and to have paperwork filled out relative to obtaining a disabled parking permit as she reportedly experienced low back pain when walking from her car to the store.  Plaintiff endorsed low exercise tolerance since undergoing chemotherapy.  She also reported improvement in her stress level as a result of her daughter moving in with her stepfather. Plaintiff was using marijuana at the time for stress management.  Upon physical examination, Plaintiff was much less agitated and angry and she was noted to be ambulating normally.  She was said to have a normal mood and affect.  The assessment was:  1) anxiety disorder, unspecified but improved and 2) chronic bronchitis.  Anxiety medication refills were deferred as Plaintiff had adequate refills left for Fluoxetine and Bupropion.  (Tr. pp. 929-932).

On March 27, 2016, Plaintiff presented to the Ochsner Emergency Department complaining of pain and swelling to the left elbow for two to three days.  Examination of the area revealed no tenderness to palpation and a full range of motion.  The diagnosis was left olecranon bursitis.  Plaintiff was discharged home in stable condition with directions to use an Ace bandage and anti-inflammatories.  (Tr. pp. 782-802).  Plaintiff returned to SBHC three days later, requesting a Fluoxetine refill.  Plaintiff reported being unable to exercise for more than five minutes at a time secondary to low back pain.  However, upon physical examination she was ambulating normally and the only positive finding in the musculoskeletal domain

was limited range of motion to the left elbow with minimal tenderness to palpation. The assessment was: 1) elevated body mass index; 2) chronic bronchitis; 3) spinal stenosis of the lumbar region with intermittent neurological symptoms; 4) olecranon bursitis; and 5) anxiety. Plaintiff elected to proceed with a Kenalog injection to the elbow and immediate relief was achieved. (Tr. pp. 927-929).

Plaintiff had a routine breast cancer follow-up visit at Ochsner on June 13, 2016. (Tr. pp. 873-877). On June 24, 2016, she underwent a CT scan of the chest with contrast that revealed no significant lymphadenopathy. Plaintiff also received a CT scan of the soft tissues of the neck with contrast. That testing revealed findings suggestive of a intraparotid lymph node. (Tr. pp. 878-883). On July 7, 2016, Plaintiff was seen for the first time at the Chalmette Medical Clinic ("CMC") for the purpose of establishing a relationship with a primary care physician. Plaintiff requested pain medication for her back, relating constant pain which had worsened to a level of "9" due to increased activity while caring for her grandmother. She recalled an MRI in the past which demonstrated an L5 annular bulge. A physical examination was essentially unremarkable. The assessment was hypertension, chronic low back pain, and degenerative disc disease. Plaintiff was prescribed or received refills on various medications and was to return in two months. (Tr. pp. 921-923). Another trip to CMC was triggered by a bad cold to the chest and head on August 19, 2016. Plaintiff was given an injection of Celestone and was prescribed antibiotics. (Tr. pp. 918-920). A routine follow-up examination went forward on September 26, 2016 at Ochsner. (Tr. pp. 884-889). CT scans of the neck and chest on December 6, 2016 produced results no different from previous testing. (Tr. pp. 890-903).

14

On January 26, 2017, Plaintiff returned to CMC for medication refills. Various medications were prescribed, including an antibiotic to treat a cough and congestion from which she had been suffering for a week. (Tr. pp. 915-917). Spirometric testing was also done that day which revealed mild airway obstruction. (Tr. p. 910). Bloodwork results were reported on January 31, 2017. (Tr. pp. 905-909). The final medical report in the record documents Plaintiff's return visit to CMC on February 23, 2017 for a blood pressure check and pain in the left ear that was thought to possibly be a pimple. A physical examination was largely unremarkable. The assessment was hypertension, chronic low back pain, and degenerative disc disease. Plaintiff's medications were adjusted. (Tr. pp. 911-914).

As noted earlier, a hearing *de novo* before an ALJ went forward in this matter on April 5, 2017. The then-extant documentary evidence was formally admitted and the ALJ agreed to leave the record open for two weeks for the submission of any additional evidence. Plaintiff's counsel then moved for and was allowed to amend the alleged disability onset date to April 23, 2015. Counsel proceeded to give an opening statement in which she argued that Plaintiff was disabled under "Grid" Rule 201.09 as she was undergoing chemotherapy treatments at the time of the amended onset date and that the effects of right knee osteoarthritis and lumbar degenerative disc disease limited her to sedentary work. Alternatively, counsel argued that Plaintiff should be found disabled under Social Security Ruling 96-8p based upon major depressive and anxiety disorders and the findings of the consultative evaluator, Dr. Fontenelle. (Tr. pp. 28-34). Plaintiff was then sworn in and was questioned by the ALJ. She was 51 years of age at the time, had two children, an eighth-grade education, and lived with a friend. She had a driver's license and had driven that day, estimating that she drove an average of three times per week to places such as the grocery,

the library, and the doctor.  Plaintiff had not worked since April of 2015 and had previously worked as a cashier at a convenience store from 2007 to 2010.  That job customarily involved lifting 50 to 100 pounds and required Plaintiff to be on her feet for the majority of the time. (Tr. pp. 34-37).

Upon being tendered to her attorney for further questioning, Plaintiff testified to being status post breast cancer, a mastectomy, and chemotherapy treatments.  She had once had issues with swelling in her arm but that condition had resolved.  However, Plaintiff testified that she was frequently fatigued such that she put off tasks like cooking or doing laundry or the dishes.  She also testified to falling asleep daily for an hour or so during normal working hours.  In terms of her knee and lower back problems, Plaintiff indicated that when she was working, she would frequently have to wear a knee brace which was no longer necessary since she was not working.  Stair climbing caused her knee pain and walking increased her lower back pain.  Even lifting a gallon of milk caused low back pain and Plaintiff frequently needed the assistance of her daughter or stepfather in doing grocery shopping. She estimated that she could walk only one block before needing to take a break.  Plaintiff also suffered from some mild COPD but she continued to smoke.  She experienced anxiety attacks a few times per week and every few months, she might drive to the store but be unable to go in.  Plaintiff had few friends and would experience crying spells three or four times per month, sometimes lasting all day.   When asked, Plaintiff described her hypertension as controlled with medication.  She used an inhaler for respiratory issues approximately three to four times per month.  Plaintiff estimated that she could stand for 30 minutes at a time, maybe two hours out of an eight-hour workday if allowed to alternate sitting and standing, after which the pain would become excruciating.  Even with medication,

Plaintiff rated her back pain to be an "8." She further estimated that she could only walk one block before needing to sit down, which would relieve her pain somewhat. Plaintiff's friend assisted her with carrying in groceries. (Tr. pp. 37-43).

Continuing, Plaintiff described a typical day as spending time at the library, but she sometimes could not remember what she read. When asked if she could do household chores, Plaintiff initially answered in the negative but then admitted that she could indeed wash dishes, do laundry, and cook. Sweeping and mopping were not possible as the motion irritated her back. Plaintiff testified that the main impediment to her returning to work was her back but that anxiety would possibly result if she had to leave her home to perform an outside job like security monitor or housekeeper. (Tr. pp. 43-45). Upon further questioning by the ALJ, Plaintiff admitted that she had not received treatment for her depression or anxiety from a specialist in the field despite referrals from her primary care physicians. Being around others increased Plaintiff's anxiety and worrisome thoughts but outbursts of anger were moderated through the use of Prozac. Plaintiff proceeded to describe an angry encounter she had experienced with her daughter the previous day as well as verbal altercations with others with whom she came into contact. She also recalled a physical encounter with her daughter 10 months earlier. When directed to her knee and back issues, Plaintiff testified that her doctor had told her that there was nothing that could be done for her knee but surgical intervention to her back with the insertion of hardware had been discussed but postponed by her. She had not attended physical therapy in some time, which she doubted would reduce her pain, and no doctor had recommended injections for her knee or back. (Tr. pp. 43-51).

Katrina Verdin, a VE, was the next witness to take the stand. She began by classifying Plaintiff's past job as a cashier at a convenience store as light, unskilled work with an SVP of 2 as typically performed but likely medium-level work as Plaintiff had described it. The ALJ then posed a hypothetical question to Verdin which assumed an individual of Plaintiff's age, education, and work experience who could lift and/or carry 20 pounds occasionally and 10 pounds frequently; who could stand and/or walk and sit for six hours per eight-hour workday; who could occasionally balance, stoop, kneel, crouch, and climb ramps and stairs but could not climb ladders, ropes, or scaffolds; and, who could perform tasks with an SVP level of 2 or less. With that profile in mind, the VE testified that the described individual could perform Plaintiff's past work as it is typically performed in the national economy. To a second hypothetical question the ALJ added the requirement that the individual would be limited to occasional interaction with co-workers, supervisors, and the public. Given those added limitations, Verdin testified that the described individual would be unable to perform Plaintiff's past work. However, the individual could function as a housekeeper, laundry worker, or retail/marking clerk, with a significant number of such jobs existing in the national economy. (Tr. pp. 51-54).

The ALJ then posed a third hypothetical question to the VE which assumed all of the limitations that were in the first two hypotheticals except the individual would be limited to standing and/or walking for two hours per eight-hour workday. Such an individual, the VE testified, would be limited to sedentary work. In a fourth hypothetical question, the VE was asked to consider an individual whose lifting and/or carrying capabilities, whether occasionally or frequently, were limited to 10 pounds. Verdin testified that such an individual, too, would be capable of only sedentary work. The final hypothetical included

18

the individual being off-task at least 20% of a typical workday and/or being absent from work at least three days per month.  Verdin testified that such an individual would be unable to perform any work.  In response to the ALJ's inquiry, the VE indicated that her testimony was consistent with the  information contained in the Dictionary of Occupational Titles ("DOT").  (Tr. pp. 54-55).  Despite being tendered to Plaintiff's counsel for additional questioning, counsel had no queries for the VE.  (Tr. p. 55).  Counsel did argue, however, that the ALJ's third, fourth, and fifth hypotheticals most accurately represented Plaintiff's testimony that day and that she should thus be found disabled.  (*Id.*).  The hearing was then concluded.  (Tr. pp. 55-56).

Plaintiff's first challenge to the Commissioner's decision is that the ALJ failed to apply the correct legal standard when assessing her residual functional capacity ("RFC") and that finding is therefore not supported by substantial evidence.  Under the rubric of that broad challenge, Plaintiff argues that the ALJ failed to consider the totality of the objective evidence or to properly characterize its severity in assessing her RFC, including improperly according significant weight to the findings of a state-agency medical consultant and failing to articulate the grounds therefor, and failing to discuss the DVT to her right arm.  Plaintiff also argues that the ALJ failed to adopt the findings of Dr. Fontenelle, the consultative psychological evaluator, or to adequately explain why his findings were not given more weight.

The ALJ having found that Plaintiff's impairments did not satisfy the criteria of any of those set forth in the Listing of Impairments, the Regulations then required that the ALJ make an assessment of Plaintiff's RFC, a term of art that embraces a claimant's ability to work despite her physical and/or mental limitations.   20 C.F.R. §§404.1520(e), 404.1545,

416.920(e), 416.945; *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5ᵗʰ Cir. 1988).  Just like the ultimate decision of whether a claimant is disabled, the responsibility for determining a claimant's RFC is reserved to the Commissioner and at the hearing level, that assessment is entrusted to the ALJ.  20 C.F.R. §§404.1527(d)(2), 404.1546(c), 416.927(d)(2), 416.946(c).

After considering the "entire record," the ALJ assessed Plaintiff as retaining the RFC to perform light work as defined in 20 C.F.R. §§404.1567(b) and 416.967(b)[1] except that she could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; could not climb ladders, ropes, or scaffolds; required work with an SVP of two or less; and would be limited to occasional interaction with co-workers, supervisors, and the public.  In making that assessment, the ALJ discussed the body of the evidence before her, including Plaintiff's hearing testimony, the Function Report she had completed in this case, and the medical records of the numerous doctors who had treated and evaluated Plaintiff.  (Tr. pp. 16-19).  In doing so, the ALJ noted that Plaintiff's treatment for breast cancer had ended in 2015 and that the record contained little evidence respecting Plaintiff's back and right knee problems, the two other stated bases for disability.  Having reviewed that record in its entirety, the Court agrees with that observation.  During routine follow-up visits to Ochsner in April and May of 2015, physical examination findings revealed a normal range of motion throughout with no edema or tenderness and Plaintiff's mood and affect were said to be normal.  At an evaluation at SBHC on June 18, 2015, Plaintiff was described as being irritable secondary to

---

[1] Light work is defined, in part, as that which "… involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weight up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§404.1567(b), 416.967(b).

family issues and was diagnosed with insomnia and anxiety disorder, not otherwise specified. However, self-care skills were characterized as good.

By the time of Dr. Ellis' consultative evaluation on August 7, 2015, Plaintiff had completed chemotherapy one month earlier. She complained of chronic low back pain over the years that was unrelated to any accident or trauma and knee pain as a result of a motor vehicle accident some time earlier that required surgery. Although there was a slight reduction in range of motion to the lumbar spine and right knee, straight leg raising was negative and Plaintiff ambulated without difficulty. Dr. Ellis noted that Plaintiff was independent in the activities of daily living and could drive and perform household chores. X-rays demonstrated only mild osteoarthritis in the knee and a mental-status examination was largely normal.

On September 16, 2015, Plaintiff complained of swollen feet, sleep difficulties, and anxiety as well as increased lower back pain and fatigue and occasional headaches. On examination, she had edema to the knees, which were tender to palpation but the results were thought to be out of proportion to the examination. Plaintiff was referred to physical therapy but apparently failed to follow that suggested mode of treatment as she was required to do. 20 C.F.R. §§404.1530, 416.930 (need to follow prescribed treatment). Several days later, Plaintiff presented to the emergency room complaining of leg swelling for one week but a physical examination revealed no edema. An ultrasound of the lower extremities was performed and was negative. Plaintiff complained again of fluid to the ankles and feet for two to three days on October 16, 2015 but she could ambulate normally and was described as "more active" with activities like moving her residence and shopping. Her calves were symmetric in size with no pain or varicosities. The diagnosis was swelling

of the lower legs of unknown etiology and Plaintiff was simply instructed to wear compression socks and to elevate her feet as needed. Another several-day flare of leg swelling occurred in December of 2015 but an ultrasound of the lower extremities was negative for evidence of DVT and Plaintiff was only administered a dose of Lasix. On January 4, 2016, Plaintiff reported to her doctor at SBHC that she was not wearing compression socks as had been recommended but she reportedly had been spending a lot of time on her feet cleaning and doing housework. Ambulation was normal at this time. Plaintiff was described as anxious and "tremulous" when angry. The assessment included dependent edema from working on her feet and Plaintiff was once again advised to use compression socks and to elevate her feet as needed.

Four days later, Plaintiff was consultatively evaluated by Dr. Fontenelle who found her mood and affect to be depressed and overly emotional with symptoms of anxiety over health-related problems, stress and frequent panic attacks, and social avoidance and anhedonia. However, cognition was in the low average range, social comprehension and conversational skills were normal, and personal insight was fair. Despite not having been provided with any of Plaintiff's previous medical records and thus based solely on Plaintiff's self-report, the doctor opined that Plaintiff would struggle in completing job duties as her pace, concentration, and persistence were extremely limited due to medical factors and that her relationships with co-workers and supervisors were problematic due to depression and anxiety. Dr. Fontenelle also noted that Plaintiff struggled with her motor skills and motor activity due to motor tremors, despite there being no prior evidence of any such functional deficits. In any event, when she was next seen at SBHC on February 10, 2016, Plaintiff reported a greatly improved stress level as a result of her daughter moving out and

decreased anger and agitation.  Ambulation was normal.  The diagnoses were improved anxiety and bronchitis; no mention was made of any back or knee problems.

Plaintiff was seen for pain and swelling to the left elbow for the previous two to three days on March 27, 2016 but an examination was normal.  Treatment consisted only of an Ace bandage and the use of anti-inflammatories.  Three days later, despite claiming to be unable to exercise for more than five minutes as a result of lower back pain, on physical examination she was ambulating normally and the only positive finding relative to the musculoskeletal system was limited range of motion to the left elbow with minimal tenderness to palpation. The diagnosis admittedly included spinal stenosis of the lumbar region with intermittent neurological symptoms, but the only treatment rendered at the time was an injection to the elbow.  Plaintiff did complain of increased low back pain on July 7, 2016 that was attributable to increased physical activity in caring for her grandmother.  A physical examination was largely unremarkable.  Except for two follow-up visits related to her breast cancer, the rest of the medical care Plaintiff received was unrelated to the three claimed bases of disability.

Plaintiff's first challenge to the Commissioner's decision does not implicate the correctness of the legal standard used by the ALJ in assessing her RFC as much as it does the sufficiency of the evidence that the ALJ relied upon in making that assessment.  Initially, the Court observes that in her applications for Social Security benefits and related paperwork, Plaintiff identified only back and right knee problems and stage II Paget's cancer as the conditions resulting in her inability to work; she identified no other conditions as disabling, including any mental impairments.  *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989).  The Court also recalls the well-established rule that the responsibility of weighing the evidence and determining the credibility of witnesses' testimony and doctor opinions lies with the ALJ

in the first instance. *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir 1991); *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 129 (5th Cir. 1991); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). The law is also clear that the ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of <u>any</u> physician when the evidence supports a contrary conclusion. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000)(quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled in part on other grounds by Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080 (2000)). Even a treating physician's opinions are not conclusive and may be assigned little or no weight when good cause is shown. *Newton*, 209 F.3d at 456 (citing *Brown v. Apfel*, 192 F.3d 492, 500 (5th Cir. 1999) and *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984 (1995)). Good cause exists when a doctor's opinions are so brief and conclusory that they lack persuasive weight, when they are not supported by medically acceptable techniques, or when the evidence supports a different conclusion. *Newton*, 209 F.3d at 456; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987); *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

Contrary to Plaintiff's present assertion, the Court believes that the ALJ properly weighed Plaintiff's complaints of pain and other limitations against the objective evidence of record in assessing her RFC. *Anderson v. Sullivan*, 887 F.2d 630, 630 (5th Cir. 1989)(citing *Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988)); *Harrell*, 862 F.2d at 480. As observed by the ALJ, Plaintiff's treatment for breast cancer ended in 2015 and the evidence of treatment for Plaintiff's back and right knee after that date was fairly scant. As far as the record reflects, at no time during the relevant time period was Plaintiff under the care of a specialist in the field of orthopedics for those conditions and at no time did any of her

treating physicians place any limitations on her activities, a proper consideration in a Social Security proceeding. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995); *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995). Although Plaintiff also faults the ALJ for failing to discuss her right arm DVT in assessing her RFC, a condition that was not identified as disabling in her applications for Social Security benefits, the reason therefor becomes obvious based upon a simple reading of the ALJ's decision. Early on in the decision, in connection with her step-two finding under §§404.1520/416.920, the ALJ properly discussed the medical evidence pertaining to that condition in finding that it was not a severe impairment within the meaning of the Regulations, including Plaintiff's hearing testimony that the condition had fully resolved when her chemotherapy ended in 2015. (Tr. p. 14).

Plaintiff also takes exception with the weight that the ALJ afforded to the opinions of various doctors, including Dr. Brown, a state-agency medical consultant, and Dr. Fontenelle, the consultative psychological evaluator. A review of the record reveals that in connection with consideration of Plaintiff's applications at the first step of the Commissioner's administrative review process, Dr. Brown reviewed all of the evidence that was then extant, including the reports of Dr. Fontenelle and Dr. Ellis. (Tr. pp. 57-75, 78-96). As respects the former, although Dr. Brown accorded "moderate weight" to the examination findings of Dr. Fontenelle, he opined that "[o]verall, the available information supports the clmt's ability to perform simple, routine, repetitive tasks in a setting where interpersonal  contact is incidental to work performed; supervision required is simple, direct and concrete." (Tr. pp. 71-72, 92-93). For her part, the ALJ gave the opinions of Dr. Brown, a state-agency medical consultant with considerable expertise in Social Security proceedings whose opinions must be duly considered, ALJ, 20 C.F.R. §§404.1527(e), 416.927(e), "significant weight" as respects

25

Plaintiff's exertional capabilities but only "partial weight" regarding Plaintiff's non-exertional limitations.  (Tr. p. 19).  As for Dr. Fontenelle, the ALJ similarly gave his opinions "partial weight" for the reasons that she assigned.  (Tr. p. 18).  That the ALJ may have arrived at different conclusions from Dr. Brown demonstrates only that the ALJ was properly performing her role of weighing conflicting evidence and resolving the conflicts.  *Heck v. Colvin*, 674 Fed.Appx. 411, 415 (5th Cir. 2017).  For what it is worth, the Court simply notes that some of Dr. Fontenelle's opinions, particularly his conclusion that Plaintiff struggled with motor skills and activity due to motor tremors, are totally lacking objective support in the record.  The ALJ's RFC assessment adequately embraced the limitations noted by Dr. Fontenelle that are supported by the record.

Finally, at the administrative hearing that was held in this matter, the VE testified that there were various jobs in the national economy that Plaintiff could perform.  However, despite being afforded the opportunity, Plaintiff's attorney neither cross-examined the VE nor provided any contrary evidence.  The Fifth Circuit "ha[s] held that where the claimant offers no evidence contrary to the VE's testimony, the claimant fails to meet his burden of proof under the fifth step of the disability analysis." *Perez v. Barnhart*, 415 F.3d 457, 464 (5th Cir. 2005)(citing *Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002) and *Vaughan*, 58 F.3d at 132).  Accordingly, substantial evidence supports the ALJ's determination that Plaintiff was capable of performing a limited range of light work.

Plaintiff's second challenge to the Commissioner's decision is that the ALJ erred by failing to find that she was disabled under Rule 201.09 of the Medical Vocational Guidelines (*i.e.*, the "Grids").

At the fifth step of the sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, the ALJ must determine if there is other work available that a claimant can perform. "When the claimant suffers only from exertional impairments or his non-exertional impairments do not significantly affect his residual functional capacity, the ALJ may rely exclusively on the Guidelines in determining whether there is other work available that the claimant can perform." *Selders*, 914 F.2d at 618 (citing 20 C.F.R. §404.1569 and Subpt. P, App. 2; *Fraga*, 810 F.2d at 1304)(emphasis added). "Otherwise, the ALJ must rely upon vocational testimony or other similar evidence to establish that such jobs exist." Fraga, 810 F.2d at 1304 (citing *Lawler*, 761 F.2d at 198) (emphasis added). "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1985). "A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job." *Id.* Although the Regulations do allow an ALJ to take administrative notice of available job data in publications such as the DOT, 20 C.F.R. §§404.1566(d) and 416.966(d), the Fifth Circuit has questioned whether the DOT amounts to "similar evidence" which can be used to satisfy the Commissioner's burden at the fifth step of §§404.1520/416.920. *Fields*, 805 F.2d at 1170-71. In the majority of cases, the testimony of a VE is simply more specific than job data contained in publications like the DOT or in a chart. *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000).

Unlike the typical Grid case in which the claimant argues that the Medical-Vocational Guidelines were wrongfully applied in a rigid, mechanical fashion to find her not disabled,

*see, e.g., Wingo v. Bowen*, 852 F.2d 827, 831 (5th Cir. 1988), Plaintiff herein argues that the Grids <u>should</u> have been used to find her disabled under Rule 201.09.  Case law and the Regulations themselves counsel that expert vocational testimony is the preferred method of proving that there is other work available that a claimant can perform.  *Fields*, 805 F.2d at 1170-71; *Lawler*, 761 F.2d at 197-98; *Dellolio v. Heckler*, 705 F.2d 123, 126-28 (5th Cir. 1983). And where a claimant suffers from significant non-exertional impairments, such as the major depressive, anxiety, and somatic symptom disorders that were found in the present case, resort to the Grids is foreclosed.  *Newton*, 209 F.3d at 458; *Fraga*, 810 F.2d at 1304. Moreover, the Grid rule cited by Plaintiff, Rule 201.09, applies to individuals who are only capable of performing sedentary work.  As discussed earlier, because the ALJ properly found that Plaintiff retained the RFC to perform a range of light-level work, the applicable Grid rule would have been Rule 202.10 which, in light of Plaintiff's age, education, and work experience, would have directed a finding of "not disabled."

## <u>RECOMMENDATION</u>

For the foregoing reasons, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that Plaintiff's suit be dismissed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object.  *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[2/]

      New Orleans, Louisiana, this __30th__ day of _____December_____, 2019.

                                    _____

                                      MICHAEL B. NORTH
                        UNITED STATES MAGISTRATE JUDGE

---

[2/] *Douglass* referenced the previously-applicable 10-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.